***********
The Full Commission has reviewed the Deputy Commission's Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby REVERSES the Opinion and Award of Deputy Commissioner Dollar.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The PMA Group was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff filed an I.C. Form 18 on August 5, 2002 and his I.C. Form 33 Request for Hearing on August 23, 2002, on which he alleged he injured his neck and back as a result of heavy lifting in the course and scope of his employment. Defendants denied his claim, filing an I.C. Form 61 on May 13, 2002 and an amended Form 61 on June 10, 2002.
5. Based upon the Form 22, plaintiff's average weekly wage was $671.46, which yields a compensation rate of $447.66 per week.
6. The issues for determination are:
a. Did plaintiff sustain an injury by accident arising out of and in the course of his employment on April 11, 2002, and, if so, to what benefits is he entitled under the Act;
b. Is plaintiff entitled to have defendants pay his attorney's fees, pursuant to N.C. Gen. Stat. § 97-88.1;
c. Did plaintiff's actions culminating in his termination on May 28, 2002 constitute a constructive refusal of suitable employment under N.C. Gen. Stat. § 97-32;
d. Are defendants entitled to have plaintiff pay their reasonable attorney's fees, pursuant to N.C. Gen. Stat. § 97-88.1.
7. The parties stipulated the following documentary evidence:
a. I.C. Forms 18, 19, 33, 33R and 61 (two),
b. Plaintiff's recorded statement,
c. Plaintiff's Answers to Interrogatories,
d. Defendants' Answers to Interrogatories,
e. Plaintiff's personnel file, and
f. Plaintiff's medical records, 63 pages.
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 68 year old male high school graduate who had attended college but did not graduate. In 1995, plaintiff sustained a prior back injury. On April 11, 2002, plaintiff's primary residence was located in Salisbury, North Carolina. However, he maintained a second residence in Calabash, North Carolina. Beginning in 2001, plaintiff spent almost every weekend at the Calabash residence, regularly missing work on Fridays and Saturdays. He has since relocated to Calabash.
2. Defendant-employer is a manufacturer of industrial freezers and refrigerators. Beginning on May 28, 1990, plaintiff worked as a shear operator with defendant-employer, and his duties included getting measurements to begin the manufacturing process to cut flat pieces of sheet metal for the exterior of freezers and refrigerators and placing sheet metal on skids to be processed by the shearer machine. The machine cuts the pieces down into the size for component parts for refrigerators and freezers. The shear operator loads large metal sheets, the largest of which measure four feet by twelve feet. The sheets weigh 150 to 180 pounds, depending on the type of metal to be sheared.
3. Plaintiff was a good worker despite having ongoing attendance problems. Prior to April 2002, plaintiff was transferred from the shear operator job to the process technician position due to his attendance problems. In that the rest of the production in the plant was dependent upon the pieces being processed by the shear operator at the start of the manufacturing process, it was critical to have an employee with excellent attendance in the shear operator job. In his job as a process technician, plaintiff performed piece work throughout the plant, including working in the shearer, press break and end-up areas. Plaintiff was cross-trained to perform the duties of these various jobs.
4. On April 11, 2002 at approximately 7:30 a.m., plaintiff's foreman, Tim Bell, assigned him to work at press break in the forming material job, where plaintiff was to be the helper for Emerson Nance. The metal sheets weigh approximately 60-80 pounds. The pieces of metal are the same dimensions as those pieces that come out of the shearer. The pieces that are machined in the shearer are next taken to the press break area to be formed. Therefore, heavier metal pieces were lifted over a continuous period of time at the shearer job than at the press break job.
5. Plaintiff and Mr. Nance retrieved pieces of metal from one table, carried it to a higher table, formed it, removed it from the machine and carried it to a dolly. Plaintiff complained to Mr. Nance that he did not want to be on the press break job the entire shift.
6. At the hearing before the Deputy Commissioner, plaintiff testified that around 2:00 p.m. on April 11, 2002 he began to experience pain in his neck and arms. Plaintiff further testified that by 3:00 p.m. his neck and back pain had increased to the extent that he momentarily lost control of the metal he was lifting. Mr. Nance, who was working with plaintiff at the press break job, did not recall hearing plaintiff cry out in pain or lose control of the metal. Mr. Nance did recall that plaintiff complained about his neck hurting so much throughout the day that Mr. Nance told him he should go see Mr. Bell.
7. On April 11, 2002, plaintiff told Mr. Bell he had injured his neck while he was lifting metal. Mr. Bell completed an accident report and transported plaintiff to Pro-Med, the company's doctors, for medical treatment.
8. At Pro-Med Minor Emergency Center, Dr. Rodney K. Justin examined plaintiff and diagnosed him with a cervical and lumbar strain which he causally related to the lifting incident on April 11, 2002. Dr. Justin prescribed pain medication and provided light duty work restrictions of no lifting over ten pounds and no repetitive neck movement. During the exam, Dr. Justin found plaintiff exhibited inconsistent subjective results on testing which possibly indicated symptom magnification. Dr. Justin also ordered physical therapy.
9. Plaintiff returned on April 12, 2002 to light duty work in the metal shop, where he was assigned to do end caps, forming and notching the ends of metal. This job did not require plaintiff to lift over ten pounds and was a regular job in the manufacturing plant. The job was not a production job so that plaintiff was not required to carry more than one piece at a time. Plaintiff had a floor lift to pick up pieces of metal and did not have to stoop or bend. He was also assigned to feed material into a machine. The light duty work which defendant-employer provided to plaintiff after April 11, 2002 was suitable to his restrictions.
10. On April 13, 2002, plaintiff called defendant-employer to report his absence from work, as he had traveled to the beach.
11. On April 17, 2002, Dr. David M. Mobley at Pro-Med saw plaintiff, at which time he found plaintiff demonstrated atypical diagnostic test results for the type of injury sustained. On April 23, 2002, Dr. Justin saw plaintiff again, at which time plaintiff indicated the low back symptoms were virtually gone and he was feeling 50% better. Dr. Justin found any limitation which plaintiff had was due to his age and not due to any back strain sustained at work.
12. On April 30, 2002, Dr. Joseph Holmes at Pro-Med saw plaintiff, at which time plaintiff reported no low back problems. Dr. Holmes found plaintiff reached maximum medical improvement at that time and assigned no permanent functional impairment to the back. Dr. Holmes causally related plaintiff's cervical strain to the lifting incident on April 11, 2002.
13. Under defendant-employer's attendance policy, employees are required to call in before the start of the shift if they are going to be absent. If the employee is only able to leave a message at the initial call in, he is required to call back in before 9:00 a.m. to personally speak with someone. Once an employee accumulates ten "occurrences," he is terminated. After 30 consecutive days with no absences, one occurrence can be deducted.
14. On May 14, 2002, Mr. Bell counseled plaintiff regarding his occurrences. On May 17, 2002, Mr. Bell again discussed attendance problems with plaintiff, advising plaintiff that he had accumulated a total of nine and one-half occurrences.
15. PMA claims adjuster Brian Grey attempted to contact plaintiff by telephone after receiving the report of injury from defendant-employer. However, after plaintiff did not respond to his telephone calls or subsequent letter, on May 13, 2002 Mr. Grey prepared an I.C. Form 61, denying compensability for the claim. Mr. Grey testified that even though the medical records may state that an injury is work-related, if the adjuster is unable to contact the employee about the claim, the claim is routinely denied.
16. Plaintiff returned to Dr. Holmes on May 14, 2002 reporting increased symptoms in his neck. As a result of plaintiff's complaints, Dr. Holmes restricted him to no repetitive head motion, no use of arms above shoulder level and no pushing or pulling more than 25 pounds. Although Dr. Holmes recommended a neurosurgical consultation, plaintiff rejected the referral. Plaintiff also informed the doctor of his plans to retire as of July 4, 2002.
17. Prior to April 11, 2002, plaintiff paid for an eight-day cruise to Mexico. On May 20, 2002, despite being informed by Mr. Bell that he had less than one day of leave remaining, plaintiff went on the cruise. Plaintiff did not tell his employer or his supervisor of the planned trip nor did he request approval for leave for this trip. While he was on his trip, plaintiff failed to contact the employer on a daily basis, as required under the attendance policy.
18. On May 28, 2002, defendant-employer terminated plaintiff for accumulating a total of nineteen and one-half occurrences, in violation of defendant-employer's attendance policy. Plaintiff's termination was due to misconduct for which any other non-injured employee would have been terminated and was unrelated to the compensable injury.
19. On May 28, 2002, plaintiff saw Dr. Mobley, who found that plaintiff demonstrated marked improvement at his exam. He scheduled plaintiff for a final visit on June 4, 2002, at which time Dr. Mobley planned to release plaintiff to full duty without restrictions. Plaintiff did not keep this appointment. At his deposition Dr. Mobley stated that the injury by accident possibly aggravated plaintiff's underlying cervical degenerative arthritis.
20. Between May 28, 2002 and April 9, 2003, plaintiff did not seek any medical treatment for his neck and back.
21. On April 9, 2003, plaintiff sought treatment with Dr. John Karl in Calabash for his neck and back. During the course of this examination, Dr. Karl diagnosed plaintiff with diabetes and high blood pressure. Dr. Karl stated his opinion that plaintiff's current complaints of neck and back pain were the result of a degenerative condition and not causally related to the April 11, 2002 incident.
22. At the Deputy Commissioner's hearing, plaintiff testified he continued to have back and neck pain, primarily when he moved his neck. Plaintiff also testified that he had looked for other employment but had not returned to work.
23. As of June 4, 2002, plaintiff reached maximum medical improvement as a result of the April 11, 2002 incident. He retains no permanent partial impairment as a result of the incident.
24. The greater weight of the competent evidence in the record supports a finding that plaintiff sustained an injury by accident arising out of his employment as a result of a specific traumatic incident of the work assigned on April 11, 2002.
25. Plaintiff does not require future medical treatment for the neck and back condition sustained as a result of the specific traumatic incident on April 11, 2002.
26. After plaintiff was terminated by defendant-employer on May 28, 2002, the greater weight of the evidence of record shows that plaintiff was capable of some work, that no doctor took him out of work, and that after his discharge any disability he had was related to his pre-existing degenerative neck and back condition and not causally related to the April 11, 2002 injury by accident.
27. The parties have prosecuted and defended this case upon reasonable grounds.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On April 11, 2002 plaintiff sustained an injury by accident arising out of his employment with defendant-employer as a result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682(1982).
3. Plaintiff's termination from employment with defendant-employer is attributable to plaintiff's misconduct, unrelated to the compensable injury, for which a non-disabled employee would ordinarily be terminated. Therefore, plaintiff's termination on May 28, 2002 constitutes a constructive refusal to perform the work provided.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996).
4. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that his inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. Austin Co. of Greensboro, supra.
5. In the case at bar the greater weight of the evidence shows that after his termination plaintiff was capable of some work, that it would not have been futile for him to look for work due to pre-existing conditions, that plaintiff did not make a reasonable effort to find other employment, and that no doctor, including Dr. Karl, took him out of work. Demery v. Perdue Farms, Inc., 142 N.C. App. 259, 545 S.E.2d 485
(2001). Therefore, after May 28, 2002, plaintiff failed to prove that he was disabled from employment due to the compensable injury and is not entitled to any compensation. N.C. Gen. Stat. § 97-29; Seagraves v.Austin Co. of Greensboro, supra.
6. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury as were required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25. However, because plaintiff's current condition is unrelated to the compensable injury by accident, he is not entitled to any further medical treatment after May 28, 2002.
7. The prosecution and defense of this claim were reasonable and not stubborn, unfounded litigiousness and, therefore, neither party is entitled to an award of attorney's fees pursuant to N.C. Gen. Stat. §97-88.1. Sparks v. Mountain Breeze Restaurant, 55 N.C. App. 663,286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following
 AWARD
1. Plaintiff's claim for workers' compensation benefits under the law must be and is hereby DENIED.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of the compensable injury by accident. The approved medical expenses do not include payment of treatment after May 28, 2002.
3. As in any case before the Commission, if either party believes that fraud has been committed, the case may be referred to the Industrial Commission Fraud Investigation Section.
4. Defendants shall bear the costs.
This the 18th day of March 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mlb